UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| NICKIE MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 18-619-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MONTGOMERY COUNTY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Nickie Miller claims that the defendants framed him for murdering Paul Brewer and caused him to spend approximately two years in jail for crimes he did not commit. As a result, he asserts various causes of action against the defendants under 42 U.S.C. § 1983 including malicious prosecution, as well as related state-law claims. However, the defendants are entitled to qualified immunity with respect to the claims under § 1983 because they did not violate clearly established law. Additionally, Miller has failed to raise a genuine issue of material fact with respect to his state-law claims. As a result, summary judgment will be granted in favor of the defendants.

**I.**

Paul Brewer's sister asked police to perform a welfare check at his home after he failed to attend a medical appointment on the morning of December 22, 2011. Officers located Brewer in his bed deceased. He had been shot once in the head and once in the neck. Brewer's wrists were secured to the bed frame and he was blindfolded.

Montgomery County Sheriff's Deputy, Detective Sergeant Ralph Charles, Jr., was assigned as the lead investigator regarding the murder. Charles went to Brewer's residence at 418 Natalie Drive in Mount Sterling, Kentucky, the morning of December 22, where he recovered various items of evidence. This included two straps that were used to secure Brewer's wrists to the bed frame, the blindfold that had been placed over Brewer's eyes, a pair of men's underwear, a pair of black fishnet stockings, a bloodied bedsheet, and Brewer's computer and cell phone. [Record No. 118-3, p. 20] An autopsy revealed that Brewer had been shot twice with a .45 caliber gun. A police canine tracked a scent around the back of the property and over an embankment to an undeveloped cul-de-sac. There, officers discovered a set of tire tracks in mud. Detective Charles photographed the tracks and attempted to mold the impressions but was unsuccessful because the casting compound did not harden. [Record No. 103-2, p. 5]

Charles immediately sought to interview those closest to Brewer, including his girlfriend, daughter, and brother. Brewer's girlfriend, Karen, did not have any relevant information but advised Charles that she and Brewer "did not engage in any type of sexual activity that included being tied up or anything of that nature." [Record No. 118-3, p. 21] Brewer's daughter, Tianna Blankenship, told Charles that she had spoken to her father on December 17, 2011, and he told her that he had met someone in Richmond and was "planning on having a threesome at some point that night." *Id. See also* Record No. 103-2, p. 12. Charles thought this was unusual information for a father to share with his daughter, but Blankenship advised him that they had just recently reconnected and that they "were more friends than anything."

On February 2, 2012, Charles went to see Brewer's brother, John Carl Brewer, at his place of business "to see if he had heard any other information."  [Record No. 118-3, p. 23]  John Carl was a retired state trooper, a realtor, and "sort of a political figure over there," so he "hear[d] things."  While Charles was talking to John Carl, Kentucky State Police Trooper Kenny Yarbrough and Powell County Sheriff's Deputy Robert "Rog" Matthews saw Charles' cruiser in the parking lot and asked to speak with him.

Yarbrough and Matthews informed Charles that they were investigating a burglary ring spanning several counties, including Montgomery.  According to the officers, Bobby Mize ("Bobby") had informed them that Plaintiff Miller and Cody Hall were two of the individuals responsible for the burglaries.  Further, Bobby had told the officers that Miller confessed to him that he "just had to put one down." *Id.* p. 24.  When asked what he meant, Miller reportedly stated that "sometimes you just have to do stuff like that.  We just had to put him down." *Id.*  Bobby had also stated that Hall confessed regarding his involvement and that both men indicated the event took place in Mount Sterling.  According to Bobby, Miller and Hall indicated that the man they had "put down" lived in Mount Sterling but was originally from Powell County which, according to Charles, was accurate for Paul Brewer.  Bobby also reported that Michelle Lawson was present with Hall and Miller at the time of the murder.

After receiving this information, Charles questioned Bobby, who was in custody at the Three Forks Regional Jail.  According to Charles, Bobby, his brother Rick Mize ("Rick"), and Plaintiff Miller, were "known criminals" within the Powell County Community.  *Id.* pp. 24-25.  Accordingly, Charles believed that Rick may have

information about Brewer's murder.  Bobby agreed to wear a recording device while speaking with Rick about the murder but, according to Charles, it "failed miserably" and did not produce any useful information.  *Id.* p. 27.

Charles and Montgomery County Sheriff's Deputy Detective Mark Collier interviewed Michelle Lawson at the Montgomery County Sheriff's Office on February 10, 2012.  *Id.* p. 29.  Lawson denied having knowledge of any burglaries or familiarity with Paul Brewer.  *Id.* p. 30.  She provided Detective Charles with Hall's telephone number.

Using the number provided by Lawson, Charles began exchanging text messages with Hall.  Charles, Collier, and Deputy Matthews questioned Hall at the Powell County Sheriff's Office on February 14, 2012.  Hall was familiar with Brewer because Brewer had worked with Hall's father in the past.  However, Hall stated that he had nothing to do with the robbery and murder.  He also stated that, to his knowledge, Nickie Miller had nothing to do with the crimes.  *Id.* p. 34.

Hall told Charles that he did "not run with Nick," but it was clear the two had been close in the past.  He further advised Charles that Rick and Miller had left together earlier "that day" and when Rick came back alone that night, he was driving Miller's car.  Additionally, he had a revolver that he stuffed in some drawers under his bed.  Within the next few days, Rick refused to drive into Mount Sterling, stating: "Some stuff went down the other night and I don't want to be in Mount Sterling in this car."  Hall also reported that he overheard Rick talking about "hitting a lick with Nick" and that Rick said that he

had to "hurt somebody."  Hall advised the officers that he believed Rick Mize and Misty Dehart were involved in the murder.

Charles and Collier met with Dehart on February 15, 2012.  Dehart denied any knowledge of the murder.  However, according to Charles, she reported that, at some point, Rick Mize informed her that Plaintiff Miller wanted him to "do a job."  Rick had then asked her to tell Miller that he was not afraid to kill someone.  [Record No. 118-3, p. 36]  Dehart told officers that she believed Rick was actually capable of killing someone. It was at this point in the investigation that officers learned that Bobby Mize, Rick Mize, Cody Hall, and Plaintiff Miller all "hung around each other."  Additionally, Miller and Rick Mize lived together "most of the time."  *Id.* p. 35.

Charles, Collier, and Matthews interviewed Kennie Helton on August 24, 2012.[1] *Id.* p. 39.  She also denied involvement in the robbery and murder.  She admitted knowing Rick Mize and Nickie Miller, stating that she used to hang out and use drugs with them.  Helton stated that she had heard that Rick Mize and Cody Hall were involved in the murder.  Helton agreed to provide officers a DNA sample.

Charles and Collier went to the Woodford County Detention Center to meet with Cody Hall again on August 27, 2012.  *Id.* p. 40.  Hall's statement was largely consistent with the one he provided on February 14, 2012.  Hall indicated that on the night of the

---

[1]     Neither Charles nor Collier could recall who brought up Helton as someone who should be interviewed.  [*See* Record Nos. 118-3, p. 40; 118-11, p. 27.]

murder, a car pulled up outside "the camper."[2]  He expected it to be Rick Mize and Nickie Miller and went outside to confront Miller about a disagreement they had earlier in the evening.  However, Rick was alone.  Rick stated that Miller was not in the car and that "they had a bad night and had to put someone down in Montgomery County."  Hall then saw Rick go into the camper and put a handgun under the bed.

Detective Charles interviewed Natasha Martin outside her apartment on September 4, 2012.[3]  Charles advised her that he was working a case in Montgomery County that she might be able to help him.  Martin asked, "Is this about Cody and all of them?"  Charles responded in the affirmative.  Martin agreed to answer Charles' questions after telling Charles that she was legally married to Hall but had not been with him since 2010.

> Detective Charles: . . . What—what do you—what—what case you think I'm talking about?
> Natasha Martin:  I hear they got murder, and I hear he's got indictments—
> Detective Charles:  Okay.
> Natasha Martin:  —over there, like. . .
> Detective Charles: What do you know about the murder?
> Natasha Martin:  All I know is what I hear.
> Detective Charles:  What do you hear?
> Natasha Martin:  I hear that they've been questioned over a—a Brewer man got shot.
> Detective Charles:  Uh huh.

---

[2]     While the camper is referenced several times throughout parties' exhibits and briefs, the owner of the camper is never expressly identified.  However, it appears that Hall, Miller, and Rick Mize all spent significant time at the camper.  [*See* Record No. 118-3, p. 35.]

[3]     Officers also could not recall which witnesses implicated Natasha Martin but knew that her name came up during the investigation.  [*See* Record No. 118-3, p. 40.]

Natasha Martin:  And I heard people say that there wasn't no forced entry, and I've heard people say that—the Mizes say that they done it.  I mean, I've heard everything in the world.

Detective Charles:  Who—who's telling you the Mizes are—have done it?

Natasha Martin:  Well, not really the Mizes done it, but supposedly Bobby was there, just—I've just heard that Bobby and Cody's names in—in with it. . . .

Detective Charles:  Okay.  What all—what all have you heard?

Natasha Martin:  Just that that man got shot.  I don't even know when it's supposed to be.  I guess it was a home invasion.  I mean, I'm not dumb.  I know what Nick and Cody do.

Detective Charles:  What's—what's Nick and Cody do?

Natasha Martin:  Always, like, breaking into houses and stuff.  I mean, they've been doing it for years, you know.  But, I mean, it's a scary thought to think that—you know, that they're capable of murdering somebody.  That's—I mean, that's a little different than breaking into somebody's house and just taking their belongings, which is never good anyway, but . . .

. . .

Detective Charles: . . . Do you know the Brewer?

Natasha Martin: Uh.

Detective Charles: Never met him, never been in the house, never . . . ?

Natasha Martin:  No, I couldn't tell you—I just know it happened in Mount Sterling.  I don't even know when.  I don't even know when this supposedly happened. . . .  Gossip is—well, I got told—you know, some people said they done it.  You know Rick Mize, Bobby Mize's brother?  He told me one day that they come in—I guess they'd been doing their thing, breaking in houses, whatever, and he said Cody had a gun in his hand, and Nick told him he better get—get rid of it because that'll get him life in the pen.  You know, Rick told me that.  That's been back in the summer and . . .

Detective Charles:  Why would Rick tell you this?  I mean, what was your all's conversation that led up to it?

Natasha Martin:  I think we was probably just talking about, like, just them two and—I mean, it's been—I've had a lot of conversations with people being, like, do you think they done it, you know.  And then I've heard people say that they—that supposedly there was no forced entry to the house, the man was shot in his bed, that they don't think they would have done it because they would have kicked in the door and went in to rob

- 7 -

him and wouldn't have killed him, would have tied him up.  And then I heard that [Hall's] little girlfriend was there.  I guess—I've heard people put—like, I guess his girlfriend, Michelle, is driving, and then Cody and Nick went in the house.  Then I hear no, it was Bobby driving.  I don't—I mean, gossip around here is—everybody speculating to do it.  It ain't all what do you think, you know.

[Record No. 103-7]

Officers gathered DNA samples from several individuals, including Martin, Lawson, Helton, and Dehart.  [*See* Record No. 103-8.]  A November 26, 2012 report from the Kentucky State Police forensic laboratory indicated that Natasha Martin could be included as a contributor to the mixture of DNA profiles from the left wrist restrain located at the crime scene.  *Id.* pp. 7-8.  All other individuals that were tested were excluded, with the exception of Brewer and his girlfriend.  However, when Melissa Brown, Forensic Scientist Specialist II, issued her final report on December 15, 2016, she indicated that the DNA mixture on the left wrist restraint was "too complex for meaningful comparisons."  *Id.* p. 12.

Charles met with Shelly Poe on December 23, 2014.  [Record Nos. 103-2, p. 40; 118-3, p. 50]  Poe advised that Rick Mize told her that there was a female and three males in Brewer's home the night of the robbery and "things went bad."  Poe thought the woman had been arrested for a felony previously and that her DNA would match evidence at the scene.  She also said that as soon as investigators "talked to this woman and dangled the idea of losing her kids she would sing like a canary."  Poe clarified that she was in Rick Mize's home with Rick and another male when Rick told her that he and

some friends went into Brewer's residence and "things got out of hand and he ended up dying."

Kennie Helton reached out to Charles from the Montgomery County Jail where she was being held on October 29, 2015. [Record No. 118-3, p. 51] She advised Charles that she was afraid to speak freely about the murder previously, but she was willing to do so at that time. She stated that she actually had been at Rick Mize's camper when he, Miller, and Hall returned from doing some burglaries and Miller put a gun in a vent in the camper. According to Helton, Rick told her that "they had two girls set up a threesome with a guy and once they got him tied up, they were going to rob him. Something went wrong and they killed the guy." [Record No. 103-2, p. 41] Helton stated that Rick told her that the incident occurred in Mount Sterling and was boasting that "they had just killed a cop's brother." [Record Nos. 103-2, p. 40; 118-3 p. 51]

Approximately one week later, Helton advised Montgomery County Sheriff Fred Shortridge that officers should speak with Christina Larrison and Jessica Richmond. Charles interviewed them on November 11, 2015. Larrison provided a written statement indicating that, around the time of Brewer's murder, Martin came to her house, "really upset." When Larrison asked what was wrong, Martin told her that she, Hall, Miller, and another woman had gone to a house or motel room to meet a man that had thousands of dollars and "they had told the man they would sleep with him for some money." [Record No. 103-10] According to Larrison's statement, Martin reported that the real plan was to tie him up and "have a code word" so that Hall and Miller could come in and rob him.

Larrison further reported that the "plan went through" and the women tied the man up, said the code word, and left the room.   When the men came out of Brewer's residence, Hall reportedly asked Miller "why he did what he did."   Larrison recalled Martin telling her that Miller said, "don't worry about it.   It's finished and there is no witness."   Martin also reportedly told Larrison that Hall hit the victim over the head and Miller killed the man when Hall "went to get the money." *Id.*

A deputy picked up Martin at her place of work and brought her to Sheriff Shortridge's office where she voluntarily submitted to questioning again on November 12, 2015.[4]  [Record No. 118-28]  She advised Detective Charles that her knowledge of the crime was the same as at the last interview—that she had heard around town that a Brewer man had been shot and that Miller and Hall did it with the help of a woman, possibly Kennie Helton.   Martin emphatically denied any involvement in the crime— repeatedly stating that she did not know the victim, had never met him, and had no reason to be associated with him.   She further stated that she had not talked to Cody or Nick for years prior to her September 2012 interview.

Charles and Shortridge told Martin that they had evidence showing that she was involved in Brewer's murder—specifically, DNA found at the crime scene that matched the sample she had provided and witness statements implicating her.   [*See* Record No.

---

[4]      While the beginning of the interview was not recorded, it appears that recording began before questioning began.  [Record No. 118-28, p. 7 (As Sheriff Shortridge entered the room, Detective Charles explained, "We've been talking about work . . . filling in . . . I wanted to wait 'till you get here so . . . ."  Sheriff Shortridge advised Martin of her *Miranda* rights at that point.)]  The recorded portion of the interview was approximately 52 minutes in length.

- 10 -

118-4, p. 14.]  Martin continued to deny her involvement and offered to take a polygraph examination.  One of the officers advised Martin that they already knew who the players were, they just needed to "get enough to . . . do what we have to do as far as court proceedings."  *Id.* 36.  Further, they told her, they believed she did not "take part" and they wanted to give her "an advantage on top of everybody else."

Detectives Charles and Mark Collier drove Martin to Frankfort, Kentucky for the examination.  The detectives first spoke with Kentucky State Police polygraph examiner John Fyffe and provided him background information about the case.  They told him the time, place, and location of the murder, as well as their theory of the crime, including potential suspects Miller, Hall, and Rick Mize.  [Record No. 118-12, p. 19, 35]  Fyffe then performed a pre-polygraph interview with Martin during which he eventually began asking her questions about Brewer's death.  *Id.* 21.

During the pre-polygraph interview which lasted nearly an hour, Martin consistently denied having any personal knowledge regarding Brewer's murder.  Martin reiterated that she did not know Brewer and did not know where the crime occurred.  Fyffe advised her that it occurred on Natalie Drive in Mount Sterling, Kentucky.  *Id.* 22.  He then told her the detectives' theory of the case—that two women had gone in and restrained Brewer and that "Cody and two other guys" then came in and killed him.  Fyffe went on to tell Martin that DNA matching hers was located on one of the straps securing Brewer's wrist to the bed frame.  At the time, Fyffe did not know which details were public and which were not.  *Id.* 23, 28.

Fyffe proceeded with the polygraph examination during which he asked Martin the following questions: Were you in the house when that man was shot? Did you shoot that man? Did anyone tell you they shot that man?  Did you tie that man to the bed the day he was shot?  She answered "no" to each question.  [Record No. 103-14]  Following conclusion of the polygraph examination, Fyffe left the room for several minutes.  When he returned, he pulled his chair directly in front of Martin so that he was facing her and told her that she had failed the test.   He then applied interrogation techniques he explained he had learned during his training to try and obtain a confession.   This including sitting close to Martin, holding her hand, and touching her knee to gain her trust.  [Record No. 118-12, p. 26]  He also attempted to minimize her involvement by suggesting that someone else was responsible for the murder and that she simply possessed information.

At one point, Fyffe told Martin if she would tell him who pulled the trigger she would "walk."  [Record No. 118-30, pp. 106-110]  During Fyffe's deposition, he could not recall whether this statement was true, but he conceded he did not have authority to make such a decision.  [Record No. 118-12, p. 29]  When Martin did not provide a name, Fyffe told her that if she did not cooperate, she would carry the burden by herself.  He told her that if she cooperated and identified the shooter, however, he would have no problem standing up in front of a judge and saying that she had told the truth.  *Id.* 30. Fyffe also told Martin that he would tell the judge that she had been tricked and did not know that the murder was going to occur.  Against this backdrop, Fyffe demanded

numerous times that Martin tell the truth.  Eventually, she asked to speak with Detective Charles.

Fyffe left the interrogation room.  Charles entered and questioned Martin alone for several minutes.  Martin told Charles that she was "having a real hard time" and asked whether he could tell her some things to help her remember.  Like Fyffe, Charles insisted that Martin *did* remember the events surrounding Brewer's murder or she would not have failed the polygraph test.  When Martin stated, "I have three babies at home," Charles told her to think about her children and not "carry all this weight with [her]."  When Charles then asked her again who the shooter was, Martin answered, "Nickie Miller."  When asked how she knew, she stated, "because he's the only one who would do something like that."  However, when asked how she knew that, she said, "I don't."

Defendant Fyffe reentered the interview room and advised Martin she would be much better as a witness as opposed to taking the fall for Brewer's murder.  Both officers told Martin repeatedly that she had to be truthful.  Fyffe advised her that, if she carried the blame herself, and if the DNA evidence was used against her, she would likely lose her children for a long time.  At that point, Martin asked, "Can I have my lawyer or somebody?  Because I don't know what I'm supposed to do here."  When asked whether she wanted an attorney, however, Martin did not answer.  Instead, she continued talking with the detectives—denying any knowledge of the crime.  [Record No. 118-30, p. 121]

Charles and Collier drove Martin back to the Montgomery County Sheriff's Department.[5]  [Record No. 118-3, p. 70]  Upon arrival, Charles left to attend to a personal matter and left Martin in the presence of Collier and Shortridge.  They "talked with her some more and then she requested to speak with an attorney."[6]  [Record No. 118-11, p. 46]  Martin advised that she had used attorney James Davis' office for other matters and indicated that is who she wanted Collier to call.

Davis spoke with Martin privately for about twenty minutes after he arrived at the Sheriff's office.  [Record No. 118-32, p. 14]  Immediately following the conversation, Davis called Commonwealth's Attorney Ronnie Goldy and secured a diversionary plea in exchange for Martin's truthful testimony.  *Id.* 13.  Less than an hour after having brought her back to Montgomery County, Charles received a telephone call from Sheriff Shortridge stating that Martin was ready to give a statement.

At 7:09 p.m., and in the presence of attorney Davis, Martin stated that Nickie Miller approached her about assisting him and Hall with a robbery.  [Record No. 118-33] The plan was to make the victim believe that two women were coming to have a sexual encounter with him.  The women would "go in there . . . be sweet, love on him, [and] get him tied up" so that Miller and Hall could come in.  Martin had difficulty remembering the identity of the other woman involved—stating that it was either Kennie Helton or

---

[5]     Collier was present during the initial interrogation, polygraph, and post-polygraph interrogation, but it does not appear that he asked Martin any questions.  [*See* Record No. 118-11, p. 14 (noting that Collier observed Martin's pre and post-polygraph interview).]

[6]     It does not appear that this portion of Martin's interrogation was recorded.

Kayla Walters.  She recalled that the other woman was the one who called Brewer and set up the meeting.

Martin initially could not remember how she got to Brewer's residence because she was "wilder than hell" from taking various pills.  However, she eventually recalled that Miller drove them in his Volkswagen station wagon.  After they arrived, Martin strapped Brewer to the bed and the other woman blindfolded him.  At that point, Martin stated that she went into another room and radioed to Miller who "was right around waiting somewhere" with Hall.  She went and unlocked the front door so that the men could come in.  The women exited the front door and Martin heard a shot.  After the men came out and everyone got in the car, Martin asked about the gunshot.  The men said, "sometimes you got to scare people."  Hall told her to never tell anyone and Miller told her if she said anything to anyone, he would kill her.  [Record No. 118-33]

One of the detectives asked Martin who she confided in after the fact or whether she told anyone she could not remember the events.  She stated:

> I was so wild.  I mean, honestly, it's probably in town.  Like, that's what I'm trying to tell you all.  I get flashes and pieces.  I'm trying to remember. That's why I asked you all what was said.  That way, I would, you know— you ever—you ever forget something, and whenever somebody starts talking about it, the more—and then you start—shit starts coming back to you?

Charles told her that one does not forget something as important as this.  At that point, Davis asked to speak with Martin privately.  Martin and Davis left the room after which the interview resumed.  [See Record No. 118-3, p. 72.]

- 15 -

Martin described her clothing on the night of the murder as follows: "really tight pants and hooker boots . . . a real low cut shirt, and . . . a winter coat."  The other woman had on a black jacket with fur around the hood, tall boots, and black stockings with lace around the top.  When the detective pointed out that she remembered all of these details, he asked again for the identity of the other woman.  Martin stated, "I think it was Kennie Jean.  She has real long black hair."  Within moments, Martin confirmed she was "positive" that the other woman was Helton.  Martin stated that Miller had told her he would pay her $200 for her part in the robbery.  Ultimately, she reported, he gave her "a couple of pills," and $140 in cash.

Charles showed Martin an aerial view of Brewer's neighborhood using Google Earth and asked her to show him Brewer's residence and where the group had parked.  *Id.* p. 32.  Shortridge described Natalie Drive as a "highly populated residential section of [the] community [with] [s]everal, several duplexes there."  [Record No. 118-4, p. 24] Although Martin previously denied knowing where Natalie Drive was located, Charles, Shortridge, and Davis testified during their depositions that Martin provided the officers turn-by-turn directions to Natalie Drive and correctly identified Brewer's residence. [Record Nos. 118-3, p. 62; 103-2, p. 47; 118-32, pp. 17, 21; 118-4, p. 24]  After that, the officers drove Martin back to her place of work and released her.

Martin's grandmother, Jewell Combs, testified in her deposition that Martin came home that night crying, stating that everything she had told the police was a lie.  [Record No. 118-5, p. 10]  They both agreed that Martin would go back the following day and tell officers that she had lied.  Martin and Davis met with Detectives Charles and Collier at

the Montgomery County Court Annex on November 18, 2015.  [Record No. 118-32, pp. 18-19]   Martin told Charles and Collier that her previous statement had been a lie. [Record No. 118-3, p. 75]  She first stated that Kennie Helton did not participate in the murder but, instead, it was Shelly Poe.  *Id.* 74.  Charles told Martin that he believed she was lying because Poe had been excluded based on DNA evidence.

Martin then told Charles that everything she said in her original statement had been false and she was not present for the robbery and murder.  Charles again told Martin he believed she was lying because she had provided information about the crime scene and taken officers to the crime scene.  *Id.*  Attorney Davis took Martin outside to speak to her privately.  When they returned, Charles was informed that Martin "was going to stick to her [original] statement."   Martin was arrested the following day and held at the Montgomery County Jail.  [Record No. 118-32, p. 20]

Charles testified before a Montgomery County grand jury on November 24, 2015. [Record No. 118-37] Charles advised the grand jury that Martin had confessed to murdering and robbing Brewer and that her statements had been corroborated by cooperating witnesses.  Charles testified that it had been known in the community for some time that Nickie Miller and Cody Hall were suspected of committing the robbery and murder.  Further, he testified that DNA evidence collected from a restraint used to tie Brewer to the bed came back as a match to Martin.  Charles then described Martin's confession wherein she stated that she and another woman set up a meeting with Brewer under the pretense of a sexual encounter.  Once she and the other woman had Brewer tied to the bed, they radioed to Miller and Hall who would come in and rob Brewer.

- 17 -

Charles advised the grand jury that Martin had provided details that had not been released to the public.  Additionally, he stated that Martin identified the general location of Brewer's residence and where the group had parked the night of the murder when he pulled up the decedent's residence on Google Earth.  Then, he stated, she got in the vehicle with officers and provided step-by-step directions to the residence and identified the location where they parked.

The grand jury returned an indictment charging Miller, Hall, and Martin with Brewer's murder and first-degree robbery.  [Record Nos. 103-20; 103-21] Miller and Hall were both arrested.  Miller was held at the Montgomery County Jail, while Hall was held at the Eastern Kentucky Correctional Complex.   According to Sheriff Shortridge, Martin's statement was critical when it came to finding probable cause to initiate charges against Miller.  [Record No. 118-4, pp. 10-11]

Martin retained attorney Alex Rowady in December 2015 and he quickly began working to have her bond reduced.  The Montgomery County Circuit Court scheduled a bond reduction hearing, but it was postponed repeatedly.  [*See* Record No. 118-68.] According to the plaintiff, Montgomery County Jailer Eric Jones befriended Martin while she was in custody and gave her preferential treatment among the inmates.  During phone calls to various individuals, Martin suggested that Jones was helping her get her bond reduced so that she could be released from custody.  During his deposition, Jones testified that he had no recollection of making any efforts to secure a bond for Martin.  However, Rowady testified that he recalled speaking to Jones about Martin and that the two had conversations about getting Martin's bond lowered.  [Record No. 118-48, p. 18]

- 18 -

In the meantime, Martin and Hall, apparently on improved terms, exchanged letters discussing various topics. Relevant here, Martin wrote to Hall that her confession was a lie and that attorney Davis had instructed her to "tell [the detectives] something."[7]

---

[7]  The following are relevant excerpts of the letters from Martin to Hall:

I know you told me they'd file that but it still sucks about the directions to the apt. the polygraph man told me it was on Natalie Dr. and the Det. showed me it on Google maps and they didn't record it which Alex says is fishy. . . . (Dec. 20, 2015)  [Record No. 118-34]

As for evil looks in the courtroom, what did you expect? This is bullshit I felt I got drug into by being married to you [and] the way I got done by the detectives and my [first] lawyer is why I'm here now. . . . Mama has spent $38,000 on this shit. Trying to correct the lie I told. But I've got Alex now and I trust him. (Aug. 1, 2016) [Record No. 118-61]

Here's something I wonder too. I would hope not but do you write me just to make nice [be]cause of the case? Rather [sic] we get along or not I still would've done what was right. I can't stand Nick and I'm trying to right it there too. [Record No. 118-62]

I know you've got to be stressed out with the trial coming up, but they're desperate right now so I hope that makes you feel better the Commonwealth is sweating. Craycraft told Alex that they'll give me instant release and probation IF I help them—which I'm not, like I told Alex I did not do this and I can't testify to shit. They done me dirty in the beginning—well that B/S lawyer Davis had a hand in that, all I can do to correct it is stand on the truth, so I know my statement is what done this and if you need me to come to your trial and tell the jury why I said what I did I will. I'll do what I can to fix it. I know it's all scary, I'm scared we're pretty much gambling with our lives. It's gonna be OK. I don't see God punishing people for things they didn't do. (Sept. 28, 2016) [Record No. 118-63]

Craycraft wanted to meet with me and I told Alex no [three] times before he got it thru [sic] his head that I got nothing to say to him. Offering probation on facilitation. I told Alex I got nothing to say to em [sic], they've done enough already. It's f--ed up had I been there they're willing to let me go to tell it but since I wasn't I'll have to stay. I told Alex to tell Keith to get f--ed. I been here a year already [and] I'll stay a little longer [and] fight. I'm sure he picked nicer words to tell him. So I don't know what happens next. But they was

The Montgomery County Circuit Court docket sheet reflects that an unsecured bond in the amount of $50,000.00 was set and posted by Martin on June 14, 2017. [Record No. 118-68]  That same day, the Montgomery Circuit Court entered a sealed *ex parte* order directing detention center personnel to turn over to Miller's defense team all correspondence exchanged between Martin and Hall.  [Record No. 118-70]  By the time Miller's attorney arrived at MCDC to retrieve the correspondence, however, Martin had been released and had taken with her any correspondence in her possession.

---

wanting to use me to pressure you into taking a plea.  Guess we'll see what they pull out next.  I told you I was gonna do what's right [and] stand by the truth and I mean it.  100%.  It's real shitty sitting here for some shit we didn't do.  I want the truth too, I feel I deserve that much as much as I don't like Nickie, what they're saying happened don't make sense, I don't see him doing things the way were done.  That's all I gotta say about that.  I just believe that if God's real he won't let me, you or Nick go down for this if we didn't do it.  I been praying for 11 months so we will see.  I just figured if my words are all they have you on then I should be able to tell the jury why I said that and what happened.  I don't know how all this works.  But I'll do what I can to fix it. [Record No. 118-64]

But Alex filed a motion to have bond heard the 22nd.  And he's gonna argue that B/S DNA is shit!  And the fact that there was 9 [hours] of interview [and] they erased most of it—a lot of crucial things to my defense got erased.  There's only like 2 1/2 hours in discovery when there was 9 in all.  Pretty much the whole 8 hours I told them I didn't know anything, I didn't do it until that lawyer—Davis told me to tell them something.  He's the reason I told them what I did.  I told him, I didn't do it, he said well they got your DNA and if you don't tell them something they'll arrest you [and] they say I failed a polygraph too. (Nov. 2, 2016) [Record No. 118-65]

All the missing hours to my interrogation is 7 1/2 [hours] of me telling them I didn't do it and don't know anything about it.  And what I told them is what they and the polygraph man told me.  Everything I said was told to me that day.  I didn't know what all Christina said then.  It was a straight up led statement.  I knew nothing when I walked in there they told me everything. (Dec. 9, 2016)  [Record No. 118-67

Hall and Martin began corresponding via telephone shortly after her release from custody.  Hall called Martin on June 15, 2017, asking for an update on his case.  He stated that he was willing to help and expressed frustration that the prosecution was not helping him the way it had helped Martin.  Hall indicated that he wanted to avoid any conflict of interest by speaking to Martin, but he believed there was none since they were "on the same side now."  [Record No. 118-53, p. 37]  Hall also told Martin that the police came in and took all of his property, including his mail from Martin.

Hall and Martin spoke the following day.  She advised that she knew why "they" had come and taken his mail.  [Record No. 118-53, p. 28]  According to Martin, Miller's attorney, Bridget Hofler, had "subpoenaed" both Hall and Martin's mail.  Martin told Hall that Hofler had come to get hers as well, but she had already been released.  Martin stated that Hofler "threw ten kinds of hell" because Martin's friend LaDonna, who worked in the jail's laundry department, was present when she came to collect the items.

Hall asked Martin where her mail was now.  Martin responded:  "She went in the office and called me.  Not here.  I got rid of it.  It's burnt."[8]  *Id.*  Hall stated, "I had all those letters you wrote me."  When Martin insisted "there ain't nothing in them," Hall said, "there's a few things you know . . . you said you lied in those letters.  You know what I'm saying?  Those letters are bad."  Martin questioned, "Who wouldn't have said

---

[8]      The record also indicates that Martin had two telephone conversations with prosecutor Craycraft that day, outside the presence of her attorney.  At his deposition, Craycraft acknowledged having had two conversations—the first with Alex Rowady's permission.  During the first conversation, Craycraft told Martin that he expected her to abide by her bond conditions and "not get in any trouble."  [Record No. 118-39, p. 22]  During the second, Martin called him and reported that "they" had come to the jail to get items of hers.  Craycraft advised her, "You need to call Alex."  *Id.* p. 23.

that?"  The two then agreed not to discuss the topic any further because they believed the content of their phone calls would likely be disclosed, as well.

Miller was released on bond on April 11, 2017, and the charges against him were dismissed, without prejudice, on November 21, 2017.  [Record Nos. 118-2, p. 57; 1, ¶ 204]  The charges against Hall were dismissed, without prejudice, on October 19, 2016.  On January 30, 2020, Martin pleaded guilty to facilitation of murder and complicity to second-degree robbery.   On June 8, 2020, she was sentenced to five years on the facilitation charge and ten years on the complicity charge, but her sentences were probated for five years. [Record No. 118-72]  The contents of Martin's plea agreement were not revealed on the record.  [Record No. 118-48, p. 15]  Martin was deposed in this matter but did not provide any substantive responses, instead invoking a right not to answer questions under the Fifth Amendment to United States Constitution.  [*See* Record No. 118-6.]

Miller filed suit in this Court on November 20, 2018, alleging a host of claims under 42 U.S.C. § 1983, including malicious prosecution against Defendants Jones, Fyffe, and the Defendant Officers; fabrication of evidence against Defendants Fyffe and the Defendant Officers; destruction of evidence against Defendant Craycraft; supervisory liability against Defendant Shortridge; failure to intervene against Defendants Fyffe, Jones, and "one or more Defendant Officers;" conspiracy to deprive constitutional rights against all defendants; and a *Monell* claim against Montgomery County.  Additionally, Miller asserts state-law claims of malicious prosecution against all defendants; negligent supervision against Defendant Shortridge; and respondeat superior against Montgomery

- 22 -

County.   The Court previously granted Defendant Craycraft's motion to dismiss the claims asserted against him.   [Record No. 23] Defendant Fyffe and the remaining defendants have now filed separate motions for summary judgment.   [Record Nos. 99, 103]  Additionally, Defendant Jones and the Defendant Officers have filed a motion to exclude the expert testimony of Dr. Richard Leo.  [Record No. 112]

## II.     Standard of Review

"Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Saunders v. Ford Motor Co.*, 879 F.3d 742, 748 (6th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  The moving party initially bears the burden of demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party has met the initial burden of showing the absence of a genuine dispute of material fact, the non-moving party must then come forward with specific facts showing that there is a genuine issue for trial." *McGee v. Armstrong*, 941 F.3d 859, 868 (6th Cir. 2019).   The Court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When a defense of qualified immunity is asserted, the analysis is somewhat altered.   Specifically, the existence of a disputed, material fact does not preclude

- 23 -

summary judgment if the defendants cannot be shown to have violated clearly-established law.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).

### III.   Discussion

To prevail under 42 U.S.C. § 1983, the plaintiff must show that he was deprived of a right secured by the Constitution or laws of the United States and the deprivation was caused by a person acting under color of state law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Mills v. City of Barbourville*, 389 F.3d 568, 574 (6th Cir. 2004).  There is no dispute that the defendants were acting under color of state law during the events alleged in the Complaint.

### A.   Malicious Prosecution—42 U.S.C. § 1983

Plaintiff Miller contends that Defendants Charles, Fyffe, Shortridge, Collier, and Jones maliciously prosecuted him for Brewer's murder and for robbery. "The Sixth Circuit recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010).  To establish a claim for malicious prosecution under 42 U.S.C. § 1983, the plaintiff must prove four elements: "(1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from

the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor."

*King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017).

### 1.    Probable Cause

A grand jury indictment creates a presumption of probable cause in malicious prosecution cases. *King*, 852 F.3d at 587-88. Accordingly, Miller's claims of malicious prosecution necessarily fail unless he is able to rebut the presumption of probable cause established by the return of a grand jury indictment against him. The presumption of probable cause does not apply where:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury). . .

*Id.*

In attempting to rebut the presumption of probable cause, the plaintiff relies on what he contends is false testimony Detective Charles made before the grand jury. [*See* Record No. 118, p. 90.] However, a grand jury witness has absolute immunity from any § 1983 claim based on the witness's testimony. *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012); *Jones v. Clark Cnty. Ky.*, 690 F. App'x 334, 335 (6th Cir. 2017) (observing that "a plaintiff cannot base a malicious prosecution claim solely on grand-jury testimony, even false or perjured testimony.") Absolute immunity does "not cover actions that are prior to, and independent of, the defendant's grand-jury testimony." *Jones*, 690 F. App'x

at 335 (citing *King*, 852 F.3d at 586) (internal quotation marks and alterations omitted). Accordingly, to determine whether the plaintiff has overcome the presumption of probable cause, the Court looks to the officers' alleged actions outside of Charles' grand jury testimony.

In responding to the defendants' motion for summary judgment, the plaintiff acknowledges the three-factor test set forth in *King*. [Record No. 118, p. 90] Miller makes the conclusory allegation that Detective Charles "made knowing or reckless statements in warrants and investigative letters and fabricated statements . . . ." [Record No. 118, p. 92] However, he does not point to any specific actions, statements, or omissions other than Charles' grand jury testimony, which, as explained, cannot be considered, at least in isolation. *See Tinney v. Richland Cnty.*, 678 F. App'x 362, 366-67 (6th Cir. Feb. 6, 2017) (superseded on other grounds by *Crabbs v. Scott*, 880 F.3d 292 (6th Cir. 2018)).

Miller finds many faults with the officer defendants' investigation of Brewer's murder, including their alleged failure to focus on Rick Mize as a suspect and Detective Charles' erroneous characterization of Martin's DNA as "matching" that found at the crime scene. However, there is no suggestion that any particular facts were falsified or omitted in Charles' affidavits or reports or that any officer knowingly or recklessly misled a judge or prosecutor. Accordingly, summary judgment in favor of the defendants is appropriate on this basis.

## 2.      Qualified Immunity

Although Miller does not make an explicit argument with respect to his malicious prosecution claim, he also contends that Charles, Fyffe, Collier, and Shortridge fabricated Martin's confession, which led to his prosecution.  The defendants contend that they are entitled to qualified immunity.  Qualified immunity shields government officials from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  The doctrine "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).  Qualified immunity applies regardless of whether the officer's error was a mistake of law, a mistake of fact, or a mistake based on a mixed question of law and fact.  *Id.* (citing *Pearson*, 555 U.S. at 231).

The qualified immunity analysis involves two steps: (1) whether the officer's conduct violated a constitutional right and (2) whether the right was clearly established at the time of the injury.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 236.  Once a defendant raises the qualified immunity defense, the plaintiff has the burden of demonstrating that the official is not entitled to qualified immunity.  *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010).

In evaluating whether the defendants violated Miller's clearly established rights, clearly established law is not defined at a high level of generality.  *King*, 852 F.3d at 582 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).  Instead, "the rule's contours must

be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.'"   *Saucier*, 533 U.S. at 202 (emphasis added).   While the plaintiff does not have to identify a case directly on point to demonstrate clearly established law, "the fact pattern of the prior case must be similar enough to have given fair and clear warning to officers about what the law requires."   *Beck v. Hamblen Cnty., Tenn.*, 969 F.3d 592, 599 (6th Cir. 2020) (quoting *Carroll v. Carman*, 574 U.S. 13, 16 (2014)).

The United States Supreme Court recently reaffirmed this conclusion in two excessive-force cases, finding that qualified immunity applied when no sufficiently similar case gave fair notice to police officers that their conduct was unconstitutional. *See Rivas-Villegas v. Cortesluna*, --S. Ct.--, 2021 WL 4822662 (Oct. 18, 2021); *City of Tahlequah, Ok. v. Bond*, --S. Ct.--, 2021 WL 4822664 (Oct. 18, 2021).   The Court in *Bond* explained that specificity is "especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."   2021 WL 4822664, at *2 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up)).

The Court has reviewed each of the cases Miller cites in response to the defendants' claim of qualified immunity and none of them are factually similar to the case at bar.   *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) (pre-*Rehberg* opinion in which officer omitted from preliminary hearing testimony that witness picked another suspect out of photopak);   *Rieves v. Town of Smyrna, Tn.*, 959 F.3d 678 (6th Cir. 2020) (prosecutors erroneously advised law enforcement that the

- 28 -

plaintiffs were selling illegal CBD products, resulting in their arrest); *Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002) (plaintiff alleged that defendant officer fabricated story that she hit him with her car, resulting in her prosecution for felonious assault). Likewise, the Court has reviewed the relevant case law and has identified no such authority. Accordingly, the defendants are entitled to qualified immunity with respect to Miller's claims of malicious prosecution.

### B.      Fabrication of False Evidence

Miller makes a separate claim under § 1983 that Charles, Shortridge, Collier, and Fyffe fabricated Martin's November 12, 2015, confession implicating him and leading to his prosecution. [Record No. 118, p. 105] The basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant "knowingly fabricated evidence against a plaintiff, and that there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." *Mills v. Barnard*, 869 F.3d 473, 485 (6th Cir. 2017) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). The plaintiff points out several perceived flaws in the officers' interrogation techniques including the failure to record portions of the questioning, threats and overly aggressive tactics, and feeding Martin non-public details regarding the crime. Although there is no direct proof of it, Miller contends that officers concocted a false theory of the case in which he and Cody Hall were Brewer's killers and that officers then caused Martin to "confess" this same story.

The defendants contend that they are entitled to qualified immunity with respect to the fabrication-of-evidence claim. The Sixth Circuit has observed that it is clearly

established that fabricating evidence to create probable cause to detain a suspect would violate the suspect's Fourth Amendment right to be free from unreasonable seizure. *See Ricks v. Pauch*, 2021 WL 4775145, at *4 (6th Cir. Oct. 13, 2021) (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005-07 (6th Cir. 1999)).   However, the plaintiff has not pointed to any authority indicating that aggressive interrogation techniques cross the line from coercion to the unconstitutional fabrication of evidence.

While the Sixth Circuit does not appear to have addressed the issue directly, the Seventh Circuit has explained how fabricated evidence differs from a coerced confession.

> Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false.   Fabricated testimony is testimony that is made up; it is invariably false.   False testimony is the equivalent; it is testimony known to be untrue by the witness and whoever cajoled or coerced the witness to give it.

*Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014).   In other words, an officer fabricating evidence that he knows to be false is different that "getting a reluctant witness to say what may be true." *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) (quoting *Fields,* 740 F.3d at 1112).

It is notable that Martin was given *Miranda* warnings at the outset of the interview and agreed to speak with officers without an attorney.   She is a high school graduate and, as evidenced in the interrogation recordings, is an intelligent individual who understood the nature of the proceedings.   While the interrogation was several hours long, she never asked to stop the questioning.   She expressed an ambivalent desire to have an attorney at one point during the interrogation but abandoned the request and voluntarily continued speaking with the officers.   And while the officers' references to losing her children

could be viewed as coercive, the Sixth Circuit has explained that the police are not forbidden "from conveying to suspects the seriousness of the crime for which they are being investigated." *McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir. 2006).

Miller has the burden of demonstrating that qualified immunity does not apply. As explained, one prong of that analysis requires him to show that the defendants violated clearly established law. However, the cases upon which he relies present vastly different factual scenarios than that before the Court. *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999), bears some similarities, but it is so factually distinguishable that it cannot be said to have put the officers in this case on notice that their alleged actions would violate the plaintiff's constitutional rights.

In *Spurlock*, officers were investigating the murder of Lonnie Malone. Spurlock alleged that authorities immediately focused the investigation on him. Coarsey, a Tennessee police officer, falsely claimed to have received information regarding the crime from an informant, Apple, who he knew to be a drug user. Coarsey and Satterfield, a deputy investigating the case, went to the jail where Apple was incarcerated to interrogate him. Apple initially denied any knowledge of the crime but after Coarsey and Satterfield threated, pressured, and made promises to him, he agreed to implicate Spurlock for the murder. Coarsey and Satterfield allegedly informed Apple of all details of the crime. Then, Coarsey, Satterfield, and Whitley, the district attorney, arranged a videotaped interview with Apple. However, they were not satisfied with the videotape after viewing it and put additional pressure on Apple to include a statement that he had actually witnessed the murder.

- 31 -

Apple eventually became concerned that the prosecutor was going to renege on his promises to secure Apple's release in exchange for falsely implicating Spurlock. He discussed his concerns with a guard at the jail, who recorded the conversation. Aware of Apple's concerns, Satterfield and the other defendants decided not to have Apple say that he actually witnesses the murder. Instead, they created a second recorded interview in which they instructed Apple to state that that date was the first time he had spoken with law enforcement officials regarding Malone's murder. Apple was released from jail after making the second recording. Apple's statement was presented to a grand jury, which indicted Spurlock for first degree murder. *Id.* at 999.

When Spurlock sued various officials under § 1983 for claims arising out of his prosecution, Satterfield argued that he was entitled to qualified immunity regarding the malicious prosecution and fabrication of evidence claims. *Id.* at 1005-06. However, the court observed, that "a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." The court added that the defendant could not "seriously contend that a reasonable officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights." *Id.*

The Sixth Circuit has stated, "[s]ome violations of constitutional rights are so obvious that a materially similar case is not required for the right to be clearly established." *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013). While *Satterfield* may very well be such a case, the instant one is not. *See also Jackson v. City*

- 32 -

*of Cleveland*, 925 F.3d 793, 825-26 (6th Cir. 2019) (qualified immunity did not apply when officers coerced 12-year old to falsely implicate three men in murder charges). Neither *Satterfield* nor any other case the plaintiff has identified is sufficient to put the defendants on notice that their use of interrogation techniques violates the constitutional rights of third persons. *See Hope v. Pelzer*, 536 U.S. 730, 743 (2002) (observing that the law must be sufficiently clear to provide fair warning to officials that their conduct "crossed the line of what is constitutionally permissible."). Accordingly, the defendants are entitled to qualified immunity.

## C.    Remaining Claims Under 42 U.S.C. § 1983

Miller has asserted several other claims under § 1983, including failure to supervise, failure to intervene, civil conspiracy, and a claim against Montgomery County under *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978). But each requires him to establish the existence of an underlying constitutional violation, which he has failed to do. *See Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554 (2020) (underlying violation required for § 1983 claim for supervisory liability); *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 413 (6th Cir. 2015) (same with respect to failure to intervene); *Umani v. Mich. Dep't of Corrs.*, 432 F. App'x 453, 462 (6th Cir. 2011) (same with respect to civil conspiracy); *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (same with respect to *Monell* violation). Accordingly, the defendants are entitled to summary judgment regarding the remaining claims under § 1983.

### D.      State-Law Claims

### 1.      Malicious Prosecution

Miller also brings a claim of malicious prosecution under Kentucky law. Kentucky's requirements for establishing malicious prosecution are similar to those under Sixth Circuit precedent, but the plaintiff also is required to show that the plaintiff acted with malice.  *Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016).  Consistent with federal law, "where there is a specific finding of probable cause in the underlying criminal action . . . a malicious prosecution action cannot be maintained."  *Broaddus v. Campbell*, 911 S.W.2d 281, 283 (Ky. Ct. App. 1995).  A grand jury indictment raises a presumption of probable cause that must be rebutted by the plaintiff.   *Davidson v. Castner-Knott Dy Goods Co.*, 202 S.W.3d 597, 607 (Ky. Ct. App. 2006).

For the reasons explained previously, Miller failed to rebut the presumption of probable cause and the defendants are therefore entitled to summary judgment with respect to this claim.

### 2.      Negligent Supervision and Respondeat Superior

Miller alleges in his Complaint that the "municipal defendants as well as the supervisory defendants, including Defendant Shortridge" had a duty to properly train and supervise officers, detectives, and supervisor employees of the Montgomery County Sheriff's Office and to provide adequate policies.  To the extent Miller seeks to hold Montgomery County liable under these theories, the county is entitled to absolute sovereign immunity.  *See Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 163 (Ky. 2003). And to impose liability for negligent supervision against Defendant Shortridge, the

- 34 -

plaintiff must prove an underlying tort by a subordinate, which he has not done.  *See Roth v. City of Newport*, 2008 WL 5264314, at *3 (Ky. Ct. App. Dec. 19, 2008).

The Court also notes Miller did not respond to the portion of the defendants' motion for summary judgment seeking summary judgment on these claims.  [*See* Record No. 118, p. 121 (addressing state-law malicious prosecution claim only).]  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (plaintiff deemed to have abandoned claim when he failed to address it in response to motion for summary judgment).  Accordingly, summary judgment in favor of the defendants is appropriate on this issue.

### E.      Motion to Exclude Testimony of Dr. Richard Leo

The defendants have filed a motion to exclude the testimony of Miller's proposed expert witness, Dr. Richard Leo, who purports to be an expert regarding police interviewing and interrogation methods, as well as false confessions.  However, because the defendants are entitled to summary judgment regardless of Leo's opinions, the motion to exclude will be denied as moot.

### IV.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      Defendant John Fyffe's motion for summary judgment [Record No. 99] is **GRANTED**.

2.     The motion for summary judgment filed by Ralph Charles, Jr., Mark Collier, Eric Jones, Montgomery County, Montgomery County Sheriff's Department Officers, and Fred Shortridge [Record No. 103] is **GRANTED**.

3.     The motion to exclude testimony of Dr. Richard Leo filed by Ralph Charles, Jr., Mark Collier, Eric Jones, and Montgomery County Sheriff's Department Officers [Record No. 112] is **DENIED**, as moot.

Dated:  November 5, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

- 36 -